Bryan COURTNEY and Grace E. Roggy, by her Next Friend, Bryan Courtney, Respondents,

v.

Gina M. ROGGY and Mark L. Roggy, Appellants.

No. WD 70143.

Missouri Court of Appeals, Western District.

Nov. 10, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 2009.

Application for Transfer Denied March 2, 2010.

Craig D. Ritchie and Tiffany D. Tant–Shafer, St. Joseph, MO, for Appellants.

Robert E. Sundell, Maryville, MO, for Respondent.

Before Division III: THOMAS H. NEWTON, Chief Judge, and MARK D. PFEIFFER and Karen KING MITCHELL, Judges.

MARK D. PFEIFFER, Judge.

Appellants Mark Roggy (Mark) and Gina Roggy (Gina), husband and wife, appeal the judgment of the Circuit Court of Nodaway County (trial court) declaring Respondent Bryan Courtney (Bryan) to be the father of Grace Roggy (Grace) and granting Bryan visitation rights and ordering him to pay child support.[1] Appellants raise four point on appeal. In their first point, they argue that the trial court erred in declaring Bryan's paternity because either: (a) Bryan's assertion of paternity should fail when compared to Mark's presumption of paternity; or (b) Bryan has waived his right of paternity by waiting too long to assert his rights; or (c) Bryan should be estopped from asserting his paternity rights due to a written document Bryan signed in which he declared that he would not assert his rights of paternity; or (d) that a paternity determination in favor of Bryan was not in the best interest of the child. In their second point, appellants assert that the trial court erred in granting visitation rights to Bryan because they argue the evidence demonstrates that it is not in the best interest of the child. In their third point, appellants claim that the trial court erred in permitting the paternity action to proceed when an adoption

1. Because of the common last names, we will refer to individuals in this action by their first names.

proceeding regarding Grace was simultaneously pending in a different jurisdiction. Finally, in their fourth point, appellants contend that the trial court erred in proceeding without appointing a guardian ad litem to represent the child's interests in the hearing below. We affirm.

## Statement of Facts

The facts, stated in the light most favorable to the judgment of the trial court, *McKown v. McKown*, 280 S.W.3d 169, 172 (Mo.App. W.D.2009), are as follows:

In the fall of 2000, three years after her marriage to Mark, Gina began a romantic affair with Bryan. As a direct result of the affair with Bryan, Gina became pregnant and, on May 17, 2001, Grace was born. Mark and Gina were listed on the birth certificate as the parents. However, because Mark had had a vasectomy prior to Grace's conception, he knew that Grace was not his biological daughter. In fact, Mark stipulated at trial and on appeal that Grace is not his biological daughter, and Mark further stipulated that, conversely, Bryan is Grace's biological father.

Mark was not aware of the affair between Gina and Bryan during Gina's pregnancy. He believed that Gina's pregnancy was the result of a rape that Gina had told him she suffered on September 9, 2000. During Gina's pregnancy, Mark and Gina agreed to raise the child as if the child were, in fact, a biological product of their marriage. Mark later learned of Gina's affair with Bryan but remains married to

Gina and remains desirous of serving as Grace's "Dad."[2]

At the time of her pregnancy, Gina told Bryan that there was a 50 percent chance he was the father of the baby she was carrying to term. Shortly after Grace's birth, Bryan and Gina participated in a DNA test via buccal cheek swab to determine paternity. However, unbeknownst to Bryan, Gina falsified the results of the DNA test by providing a buccal cheek swab sample from her other daughter, Lauren.[3] Upon receiving the erroneous results of the first buccal swab DNA test establishing that Grace could not be his child, Bryan urged Gina to repair her relationship with Mark and had little contact with her until 2003. At some point between May of 2001 and early 2003, Gina expressed to Bryan that she believed the test results were incorrect and that Grace was, in fact, his daughter. However, she did not reveal her deception with the tissue sample or press for another DNA test. In January of 2003, Gina brought Grace by Bryan's office. Struck by the strong physical resemblance, Bryan participated in another DNA test. On February 26, 2003, the DNA test results of this second DNA test reflected a 99.99% statistical probability that Bryan was Grace's father. In April of 2003, Gina obtained Bryan's consent to sign a document she prepared stating that he would not assert his parental rights. Bryan testified that Gina required him to sign this document as a condition of Bryan being permitted to see Grace and spend time with her.

**2.** It has not escaped this court's attention that Mark has proven to be an exemplary "Dad" for Grace. On numerous occasions spanning years, Gina has lied to Mark, and Bryan has had an illicit affair with Mark's wife. Yet, Mark remains steadfast in his adoration for, and dedication to, Grace. By all accounts, Mark has been a great "Dad" for Grace. But, section 210.822 dictates presumptions that re-

late to a "natural father" not a "Dad," and we are not permitted to re-write an otherwise unambiguous statute, for the reasons discussed *infra*.

**3.** Gina has four children in addition to Grace, three sons and a daughter, all from a previous marriage.

After the document was signed, Gina and Bryan resumed a romantic relationship from approximately early May of 2003 until November of 2005. As long as the romantic relationship between Bryan and Gina was ongoing, Gina arranged for Bryan to have frequent contacts with Grace. These father-daughter contacts included trips with Gina and Grace out of town, including some holidays. Bryan told his family and colleagues that he was Grace's father. However, at Gina's request, Bryan did not attempt to explain to Grace that he was her father or communicate to Gina's extended family that he was, in fact, Grace's father. Not so coincidentally, when Bryan ended his romantic relationship with . Gina, Gina prohibited any further contacts between Grace and Bryan. Bryan made numerous failed attempts to convince Gina to permit a continued relationship between he and Grace, all to no avail.

Consequently, on February 16, 2007, Bryan filed a petition seeking a declaration of his paternity of Grace. An evidentiary hearing spanning three days of testimony and the presentation of other evidence began on May 23, 2008, continued on May 29, 2008, and concluded on June 24, 2008. The trial court heard extensive testimony from Mark, Gina, and Bryan. The trial court also heard testimony from Dr. Marcia Meyer, a licensed professional counselor. Dr. Meyer testified that Grace suffered from separation anxiety but that there was no way of determining the long-term effects of re-introducing Bryan to Grace as her father. While she noted that there could potentially be serious negative consequences to Grace learning that Bryan was her father at this stage of her childhood development, Dr. Meyer also opined that Bryan's re-introduction into Grace's life could also potentially be a positive experience for Grace. The court entered its judgment on August 18, 2008. The judgment declared Bryan to be Grace's father but awarded Gina sole legal and physical custody. The judgment also required Bryan to pay child support and provided visitation rights to Bryan. This appeal followed.

We review the judgment of the trial court under the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Id.* The trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We not only review the facts in the light most favorable to the trial court, we also review the inferences drawn from those facts in the same manner. *Id.*

In their first point on appeal, appellants proffer four arguments for the assertion that the trial court erred, based on the premise that Bryan was estopped or otherwise prevented from asserting paternity of Grace. They argue: (1) Mark's presumption of paternity should control over Bryan's presumption of paternity; (2) Establishing paternity in favor of Bryan is not in the child's best interests; (3) Appellants Mark and Gina detrimentally relied upon Bryan's initial agreement not to petition for paternity; (4) Bryan waited too long to assert his rights and should have been deemed to have waived his right to establish paternity or equitably declared to be a non-parent due to the length of time in which Bryan failed to assert his paternity.

### Statutory Construction of § 210.822.2

Section 210.822 of the Revised Statutes of Missouri [4] states, in pertinent part:

---

4. All citations are to RSMo 2000 unless otherwise stated.

1. A man shall be presumed to be the natural father of a child if:

1) He and the child's natural mother are or have been married to each other and the child is born during the marriage

. . .

. . . .

4) An expert concludes that the blood tests show that the alleged parent is not excluded and that the probability of paternity is ninety-eight percent or higher

. . .

2. A presumption pursuant to this section *may be rebutted* in an appropriate action only by *clear and convincing evidence* . . . If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls.

(Emphasis added.)

■ In interpreting statutes, " '[t]he primary rule of statutory construction requires this Court to ascertain the intent of the legislature by considering the plain and ordinary meaning of the words used in the statute.' " *State ex rel. Womack v. Rolf,* 173 S.W.3d 634, 638 (Mo. banc 2005) (quoting *Jones v. Dir. of Revenue,* 832 S.W.2d 516, 517 (Mo. banc 1992)). " '[E]ach word, clause, sentence and section of a statute should be given meaning.' " *Id.* (quoting *Hadlock v. Dir. of Revenue,* 860 S.W.2d 335, 337 (Mo. banc 1993)). We reject an interpretation of a statute that will cause us to ignore the language of the statute. *Id.*

■ Appellants correctly argue in their brief that the plain language of section 210.822.2 dictates that courts follow a two-step process in applying the statute. Step One is to ascertain whether there is "clear and convincing" evidence to rebut a presumption that a presumed natural father is, in fact, the natural father. Step Two

only occurs when, after Step One, there remain competing presumptions that conflict with one another. If Step One fails to eliminate all but one presumed father, the trial court must then, in Step Two, weigh those remaining presumptions conflicting with each other to determine which one, on the facts, is founded on the "weightier considerations of policy and logic." To read this statutory language any other way would be to ignore the statutory language suggesting that a presumption "may be rebutted." Of course, if a presumption is rebutted by clear and convincing evidence, it no longer remains as a viable "conflicting" presumption with any remaining presumption(s).

In the case at bar, we do not need to look past the first step of the section 210.822.2 analysis. Here the trial court was presented with two presumed natural fathers under section 210.822.1: (1) Mark was presumed to be Grace's natural father because he and Gina were married to one another at the time of Grace's birth; (2) Bryan was presumed to be Grace's natural father because DNA blood tests demonstrated that the probability of Bryan's paternity was 98 percent or higher.

It is obvious from the facts of this case that there was clear and convincing evidence to rebut Mark's presumption of paternity. Mark testified that, at the time of Grace's conception, he was sterile due to a vasectomy. Mark did not deny or otherwise challenge the results of the DNA test reflecting a 99.99% probability that Bryan is Grace's natural father. In fact, all of the parties to this proceeding agreed that Bryan is Grace's natural father. In *Shadwick v. Byrd,* this court found a paternal presumption rebutted by clear and convincing evidence on less persuasive facts. 867 S.W.2d 231, 235 (Mo.App. W.D.1993). In short, the presumption that Mark was

the natural father was rebutted by clear and convincing evidence.

Conversely, there was no evidence before the trial court to rebut the DNA blood test presumption that Bryan was, and is, Grace's natural father. As stated previously, *all* of the parties *agree* that the undisputed evidence confirms that Bryan is Grace's biological (i.e. natural) father.

Accordingly, after the "Step One" analysis of section 210.822.2, there remains only one presumption that is *not* rebutted by clear and convincing evidence—namely, Bryan's presumption of paternity. Thus, after the section 210.822.2 Step One analysis, there remain no conflicting presumptions, and it is not within the trial court's discretion to engage in a section 210.822.2 "Step Two" weighing of policy and logic considerations analysis.

The trial court's conclusion that Bryan is Grace's natural father is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare the law. Accordingly, the trial court's judgment declaring Bryan to be Grace's natural father is affirmed.

## "Best Interest" Analysis at Paternity Determination Stage

■ Appellants encourage us to ignore the results of the section 210.822.2 Step One analysis and proceed with a section 210.822.2 Step Two policy weighing consideration of whether the results of the undisputed Step One analysis fail to serve Grace's best interest. However, we are not permitted to ignore the plain language of the statute, nor are we entitled to craft a "better" remedy than we believe exists in the statute. *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo. banc 1998) ("Unless a statutory scheme is plainly inadequate under circumstances where a court has a duty to act, there is no need for the court to exercise its equity powers to fashion a 'better' remedy than exists in the statutes."). Because section 210.822 provides a clear and logical method for determining paternity, we conclude that the statute does not permit the trial court or this court to skip the Step One analysis of section 210.822.2 and proceed directly to Step Two. Applied to the facts of this case, the statute allows neither the trial court nor this court to ignore the results of the Step One analysis and continue on to balancing considerations of logic and policy. Consequently, in determining Grace's *paternity,* the trial court did not err in refusing to address appellants' contention that the declaration of paternity was not in Grace's best interests. However, the trial court's judgment is not without a "best interest" analysis. It is simply that this analysis is appropriately confined to the trial court's judgment as it relates to custody and visitation issues, which we discuss, *infra,* in our discussion of point two.

■ Appellants further argue, however, that the Uniform Parentage Act (UPA), as adopted by Missouri, does provide a mechanism for determining the best interests of the child *before* a section 210.822 proceeding via the mechanism found in section 210.832. Appellants maintain that the inclusion of this option somehow mandates the trial court to employ a best interest analysis prior to determining paternity. However, that section only *authorizes* an informal pretrial proceeding where a court-appointed master conducts a hearing and, among other factors, considers whether "a judicial declaration of the relationship would be in the best interests of the child." § 210.838. As was noted in *Litvinov v. Beaird (In re D.A.B.),* a hearing under section 210.832 is an informal proceeding akin to a mediation that is not binding on either party. 238 S.W.3d 705, 706–07 (Mo. App. S.D.2007) (". . . the UPA does not establish a procedure by which the trial

court may conduct a binding, formal preliminary hearing to determine if the best interests of the child would be served by permitting the action to go forward.") Thus, the trial court below was not obligated to appoint a special master to conduct an informal and non-binding section 210.832 proceeding and, further, any conclusions of such a special master would not have been binding upon the parties anyway.[5]

### Promissory Estoppel

 Appellants next contend that the trial court should have prevented Bryan from challenging Mark's paternity on a promissory estoppel theory. They contend that Bryan, by "voluntarily" signing the agreement not to seek paternity of Grace, falsely induced them to not pursue formal adoption proceedings relating to Grace. Promissory estoppel is not a favored theory in Missouri courts. *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). Consequently, each element of the theory must "clearly appear and be proven by the party seeking its enforcement." *Id.* In *Clevenger*, the Missouri State Supreme Court laid out the four elements for a claim of promissory estoppel:

> (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure. The promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense.

*Id.* (internal citations omitted). In the instant case, prior to voluntarily permitting Bryan to have meaningful contacts with Grace, Gina made Bryan sign an agreement stating that he would not assert his right of paternity with Grace. However, because of the clear statutory directive of section 210.826.3 ("Regardless of its terms, an agreement, other than an agreement approved by the court in accordance with subsection 2 of section 210.838, between an alleged or presumed father and the mother or child, does not bar an action under this section."), that contract was unenforceable. In section 210.826, the Missouri legislature has clearly stated that agreements relating to paternity are enforceable only if they are approved by the family court. Despite this, the crux of appellants' promissory estoppel argument is that they relied upon this unenforceable agreement to their detriment. However, to give force to appellants' argument would strip the statute of its effect and permit appellants to make an end run around the statutory prohibition against enforcement of paternity agreements lacking court approval. We reject this argument. Appellants have, thus, failed to demonstrate the element of detrimental reliance. Accordingly, appellants' estoppel argument fails.

### Waiver

 Appellants next argue that since Bryan did not file the subject paternity suit until January of 2007, he should be deemed to have equitably waived his right to assert paternity. In support thereof, appellants focus upon an earlier version of section 210.822 (which Missouri's legislature abrogated prior to Grace's birth) and case law interpreting this outdated and inapplicable statutory language, declaring the policy of Missouri that equity prevented presumed fathers from *denying* paternity after a certain statutorily prescribed period of time. Section 210.826 RSMo Supp.1987 previously mandated the time

---

**5.** It should, however, be noted that the parties did engage in a pretrial mediation in an attempt to amicably resolve all issues amongst the parties. That mediation, of course, failed.

frame in which a paternity action challenging the marital presumption was required to be filed or be subject to a statute of limitation barring such proceeding.[6] According to this now outdated, abrogated, and inapplicable statutory citation, while an action to declare the *existence* of a paternal relationship could be brought "at any time" by the statutorily enumerated persons or entities, an action to declare the *nonexistence* of paternity was then required to be filed within "a reasonable time" and no more than five years after the child's birth. Most importantly, however, the action could only be filed by the child, his mother, or a presumed father whose presumption was founded upon the marital presumption. In this 1987 version of the statute, there was no presumption of paternity based upon blood tests or DNA evidence.

In 1994, however, Missouri's legislature radically departed from the 1987 statutory language of chapter 210. Specifically, the Missouri legislature made a significant revision of section 210.826. This revision eliminated the five-year statute of limitations on challenges of non-paternity by a father presumed to be so due to the marital presumption, added putative fathers to the statutory list of authorized petitioners in a paternity suit, and permitted putative fathers to challenge the existence *or* nonexistence of the father and child relationship. Currently, section 210.826 states, in relevant part: "A child, his natural mother, a man presumed to be his father under

subsection 1 of section 210.822, a man *alleging himself to be a father* ... may bring an action *at any time* for the purpose of declaring the existence **or** nonexistence of the father and child relationship presumed under subsection 1 of section 210.822." (Emphasis added.)

In summary, Missouri law has never prohibited statutorily enumerated persons or entities from filing a paternity suit to establish the existence of paternity, and it has always been the public policy of the State of Missouri to encourage the creation and maintenance of the father and child relationship. Irrespective of debate on the legislative intent behind the 1994 statutory revisions to chapter 210, in our analysis of any statute we "do not have the authority to read into a statute a legislative intent that is contrary to its plain and ordinary meaning." *State v. Rowe*, 63 S.W.3d 647, 650 (Mo. banc 2002). Since the legislature clearly and unambiguously permits an alleged father to bring an action to challenge the existence or non-existence of paternity at any time, we are not permitted to go outside that language to seek legislative intent that would prevent Bryan's paternity suit and, instead, conclude that Bryan has waived his rights to pursue the underlying paternity suit.

### Equitable Non–Parent Argument

■ Appellants next argue that even if section 210.822 is operative in general, on the facts of this case, there is precedent

---

6. The text of the statute, in relevant part, reads:

A child, his natural mother, a man presumed to be his father under subdivision (1), (2), or (3) of subsection 1 of section 210.822, or the division of child support enforcement may bring an action: (1) At any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision (1), (2), or (3) of subsection 1 of section 210.822; or (2) For the purpose of declaring the nonexistence of the father and child relationship under subdivision (1), (2), or (3) of subsection 1 of section 210.822 only if the action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five years after the child's birth. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party.

for this court to grant equitable relief and estop Bryan's petition to establish paternity. In support of their argument, appellants point to Missouri precedent that has prevented a presumed father who has held out a child as his own from changing his position. They argue that if Missouri prevents active fathers from denying their paternity, the inverse should be true as well and this court should estop a passive father from asserting his paternity. As support for this proposition, they refer us to two Missouri cases: *P.L.K. v. D.R.K.*, 852 S.W.2d 366 (Mo.App. E.D.1993) and *S.E.M v. D.M.M.*, 664 S.W.2d 665 (Mo. App. E.D.1984). However, both of these cases either predate Missouri's adoption of the UPA or rely upon a statute of limitations in the UPA to preclude the presumed father from altering their position. In contrast, we believe *Jefferson v. Jefferson* is instructive. 137 S.W.3d 510 (Mo.App. E.D.2004). In *Jefferson*, a divorcing husband and wife had three children: two were children conceived after the marriage, and one was a daughter conceived two years prior to the marriage. *Id.* at 512. Though wife had told husband that the eldest daughter was his, blood tests initiated during the divorce proceeding revealed that the eldest daughter was, in fact, not his child. *Id.* The trial court found that husband was not the father of the eldest daughter and that he would not be required to pay child support for her. *Id.* The mother appealed, citing that the father was an "equitable parent" or in the alternative, that he should be equitably estopped from denying paternity. *Id.* The Eastern District of this court concluded that the courts should not impose a judicially constructed doctrine such as "equitable parent" unless the statutory remedies were clearly inadequate, which they were not in that case. *Id.* at 513. Though the court noted that the father had acted as the child's only parent for fourteen years,

it did not find equitable estoppel to be a valid basis for precluding husband from denying his paternity:

> Although estoppel has been applied in other jurisdictions, it has never been applied where the wife has falsely misrepresented to the husband his paternity of the child, and he has acted on that misrepresentation until discovering the truth. We find no Missouri cases applying equitable estoppel in a paternity dispute such as this, and the legislature has given no authority to the courts to exercise such a power.

*Id.* at 517. We make a similar finding in the present case. We are constrained by the plain meaning of the relevant statutes as previously discussed. And, like the facts in *Jefferson*, we find it compelling that one of the reasons Bryan did not assert his rights of paternity sooner is that Gina misrepresented Bryan's paternity to Grace. Thus, we reject the invitation from appellants to unreasonably stretch the facts of this case into an equitable declaration of non-paternity, especially in light of the fact that section 210.822 is clear and unambiguous and does not leave room for appellants equitable non-parent argument.

Based upon the foregoing reasons, point one is denied.

### Custody and Visitation

In their second point on appeal, appellants contend that the trial court erred in awarding Bryan visitation rights because they allege that visitation with Bryan would be emotionally devastating and not in Grace's best interests. A trial court has broad discretion with respect to visitation and we give "even greater deference to these decisions than in other civil cases." *Pijanowski v. Pijanowski*, 272 S.W.3d 321, 326 (Mo.App. W.D.2008). We presume that, because of the trial court's better ability to gauge the credibility of

witnesses, the visitation award is in accordance with the best interests of the child. *Id.* We will reverse only if we are "'firmly convinced that the welfare and best interests of the child require otherwise.'" *Id.* (quoting *Dunkle v. Dunkle,* 158 S.W.3d 823, 833 (Mo.App. E.D.2005)). We will defer to the judgment of the trial court even if the evidence could support a different conclusion. *Foster v. Foster,* 149 S.W.3d 575, 579 (Mo.App. W.D.2004).

Because sole legal and physical custody was awarded to Gina, the trial court's determination on visitation was controlled by section 452.400 RSMo 2005. Section 452.400.1(1) states that "A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his or her emotional development." In the instant case, Bryan was granted reasonable visitation rights. However, the court attached a significant condition to those rights. The trial court ordered that Bryan's visitation would be directed by a recognized child therapist, selected by Gina, and Bryan's visitation should only commence after a period of counseling for the parties involved.[7] The therapy and the monitoring of the visitation by the child therapist would continue for as long as it was deemed necessary by the child therapist. It is clear that the trial court was admirably attempting to craft a visitation award in such a manner that was designed to prevent any emotional regression by Grace.

▆▆▆ Appellants argue that the court's *restriction* of Bryan's visitation is evidence that the court was aware that such visitation could "impair her emotional development." Confusingly, they then argue that because of this alleged implicit finding of emotional impairment, the appropriate remedy would be to restrict Bryan's visitation to Grace. This argument is circular and self-defeating. As appellants acknowledge, the court *did* build in restrictions to Bryan's right of visitation with Grace. Bryan is permitted visitation with Grace only after the completion of therapy and under the direction of a recognized child therapist. When Bryan does receive visitation, it will be with the further condition that the therapy and monitoring continue as long as it is deemed necessary by the therapist. These are significant restrictions on Bryan's access that take into account the sensitive nature of the situation. Restricted visitation is the primary remedy a trial court uses when faced with a situation where the child might be endangered by contact with the parent. *Wills v. Wills,* 197 S.W.3d 187, 192 (Mo.App. W.D. 2006). Though appellants urge us to find that the trial court should have denied Bryan any visitation with Grace, we were unable to find, and appellants did not cite to, a single case where a trial court denied visitation without evidence of past physical or emotional abuse, none of which is alleged or exists in this case. We do not find a basis for overturning the trial court's determination in this matter. Point two is denied.

### Stay of Proceedings

▆▆▆ In their third point on appeal, appellants maintain that the trial court erred in refusing to stay the paternity proceeding because appellants had filed an adoption case featuring the same parties in

---

7. Effectively, the trial court has vested the modification of visitation rights to an unnamed child therapist who is not a party to the underlying proceeding. Based upon the record that has been presented to us, we question whether chapter 452 authorizes this directive by the trial court. However, neither party raised this issue to the trial court nor in this court, and consequently, we do not address that topic in our ruling today.

a different jurisdiction.[8] Appellants argue that a stay of proceedings was necessary to avoid conflicting verdicts. " 'The granting or refusing of a stay of proceedings rests in the trial court's discretion, the exercise of which will not be disturbed on appeal unless clearly abused.' " *Simpson v. Strong*, 234 S.W.3d 567, 583 (Mo.App. S.D.2007) (quoting *Green v. Miller*, 851 S.W.2d 553, 556 (Mo.App. W.D.1993)).

In support of their argument, appellants refer us to *Kelly v. Kelly*, 245 S.W.3d 308 (Mo.App. W.D.2008), which relies heavily upon the Missouri Supreme Court case of *State ex rel. Womack v. Rolf*, 173 S.W.3d 634 (Mo. banc 2005). *Womack* and its progeny stand for the assertion that it is permissible to file an adoption proceeding before the same judge who is deciding a chapter 211 neglect or termination of parental rights proceeding that might result in a conflicting judgment. *Id.* at 638. *Womack* ruled that this was permissible because section 211.093 implicitly allows for such concurrent proceedings by providing for a resolution of inconsistent verdicts. That statute states:

> Any order or judgment entered by the court under authority of this chapter [211] or chapter 210, RSMo, shall, so long as such order or judgment remains in effect, take precedence over any order or judgment concerning the status or custody of a child under age twenty-one entered by a court under authority of chapter 452, 453, 454 or 455, RSMo, but only to the extent inconsistent therewith.

§ 211.093. Because adoption petitions are handled under chapter 453, they are subservient to section 211.093. An examination of that statute demonstrates that appellants' attempt to rely upon section 211.093 is misplaced. If we were to accept the argument of appellants, the paternity proceeding would have been stayed until after the adoption action. However, as is clear from section 211.093, any portion of the adoption proceeding that was inconsistent with the paternity suit would have been invalid. It would be inefficient and illogical to stay a proceeding that is ripe for adjudication in favor of a subsequently filed action that, when it was decided, would be subservient where it was inconsistent with the already pending paternity suit. Furthermore, it should be noted that neither *Womack* nor *Kelly* involved an appellant seeking to stay a proceeding, only whether or not concurrent proceedings would be dismissed or allowed to continue. Consequently, neither examined the issue of whether one proceeding could be stayed in favor of the other. The trial court did not abuse its discretion in denying the motion for stay of proceedings, and point three is without merit.

## Guardian Ad Litem

 In their fourth and final point, appellants argue that the trial court erred in proceeding with the paternity action without appointing a guardian ad litem (GAL) because they maintain that Bryan's interests conflict with Grace's interests. A court's appointment of a guardian ad litem is discretionary. *State ex rel. Dept. of Soc. Servs. v. Kobusch*, 908 S.W.2d 383, 385 (Mo.App. E.D.1995). Because there was no request by any party for a GAL, and there were no allegations of child abuse or findings that Grace's interest diverged from Bryan's at the trial court proceedings below, the trial court's decision not to *sua sponte* appoint a GAL was not error. In paternity actions, whether a GAL shall be

---

**8.** Of note, Appellants filed the adoption case *after* the underlying paternity suit had been filed by Bryan.

appointed is governed by section 210.830. That statute states, in relevant part, "[a] guardian ad litem shall be appointed for the child only if child abuse or neglect is alleged, or if the child is named as a defendant, or if the court determines that the interests of the child and his next friend are in conflict." § 210.830. Here, though neither party made the argument that a GAL was indicated, the trial court *sua sponte* took up the question of whether the appointment of a GAL was necessary in pretrial proceedings:

THE COURT: And Mr. Sundell, as the petitioner you've not made a request for a guardian ad litem up to this point? [9]

MR. SUNDELL: Judge, the abuse and neglect [the Roggys] are talking about is the statutory definition in the adoption proceeding. I specifically asked the psychologist if she had any concerns about Bryan being a danger to the child and she said no. I asked Miss Roggy in her deposition whether she was alleging Mr. Courtney would be a danger to the child from the terms of abuse and neglect and she said no.

THE COURT: Mr. Ritchie.

MR. RITCHIE: Judge, we don't allege that he physically presents any sort of risk to the child. However—and we kind of raised this sometime ago in at least the pretrial conference. Because of the complexity of this matter and the issues, I think, the court is well within its right to appoint a guardian ad litem to help assist everyone in determining what is in the best interests of the child. Again, that is obviously up to the court's discretion. I don't think it's mandatory at this point.

As the transcript reveals, at the time of trial neither party argued that appointment of a GAL was necessary. Furthermore, at trial and in their brief, appellants concede that there was no allegation or evidence of abuse or neglect. Rather, the entire argument by appellants on this topic is rooted in the contention, raised first at the appellate level, that Bryan's interests as next friend of Grace, as a matter of law, conflict with Grace's interests. However, appellants failed to make this argument to the trial court, and based upon a trial record that was devoid of any evidence requiring the appointment of a GAL, the trial court did not abuse its discretion in choosing not to appoint a GAL. Accordingly, point four is without merit.

The trial court's judgment is affirmed.

THOMAS H. NEWTON, Chief Judge, and KAREN KING MITCHELL, Judge, concur.

---

9. Mr. Sundell was the attorney for Bryan and Mr. Ritchie was the attorney for the Roggys.