

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

IN RE THE MATTER OF: A.I.A.K. )
& E.H.K. BY S.A.K. AS NEXT )
FRIEND AND S.A.K. INDIVIDUALLY, )
)
     Appellant, )
)
v. ) WD86240 (Consolidated with
) WD86241)
)
T.M.K., ) Opinion filed: April 2, 2024
)
     Respondent, )
)
M.L.K., )
)
     Respondent, )
)
R.J.R., )
)
     Respondent. )

**APPEAL FROM THE CIRCUIT COURT OF
PLATTE COUNTY, MISSOURI
THE HONORABLE THOMAS FINCHAM, JUDGE**

Division Four: Gary D. Witt, Chief Judge, W. Douglas Thomson, Judge
and Roger M. Prokes, Special Judge

Appellant S.A.K., individually and on behalf of A.I.A.K. and E.H.K. (the "Children") appeals from the trial court's judgment finding that Respondent T.M.K. is the natural parent of the Children. On appeal, Appellant argues that the trial

court misapplied the law in finding that Respondent is the natural mother of the Children even when blood tests demonstrate that she is not biologically related to either Child. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

We set forth the facts in this case in a previous appeal. *See S.K., et al. v. T.K., M.K., and R.R.*, 665 S.W.3d 388 (Mo. App. W.D. 2023):

> On multiple occasions in 2015 and 2016, M.K. donated semen to Appellant and Respondent, two females in a romantic relationship. Appellant and Respondent used M.K.'s semen to artificially inseminate Appellant. Prior to M.K.'s donations, Appellant, Respondent, and M.K. agreed that M.K. would have no claim or interest in any child that resulted from the insemination; that M.K. would have no contact or relationship with any resulting child; that M.K. would not be identified on any resulting child's birth certificate; and that M.K. would consent to an adoption of any resulting child in the future, if necessary. One of the attempts of artificial insemination was successful. When Appellant and Respondent were married in October 2016, Appellant was pregnant with Daughter. Daughter was born in December 2016, and Appellant and Respondent were identified as Daughter's parents on her birth certificate, despite none of Respondent's genetic material being used to conceive Daughter.
>
> During 2017, R.R. donated semen to Appellant and Respondent, and the couple used R.R.'s semen to artificially inseminate Appellant. Prior to R.R.'s donations, Appellant, Respondent, and R.R. agreed that R.R. would have no claim or interest in any child that resulted from the insemination; that R.R. would have no contact or relationship with any resulting child; that R.R. would not be identified on any resulting child's birth certificate; and that R.R. would consent to an adoption of any resulting child in the future, if necessary. One of the attempts of artificial insemination was successful, and Son was born in October 2017. Appellant and Respondent were identified as Son's parents on his birth certificate, despite none of Respondent's genetic material being used to conceive Son.
>
> Appellant and Respondent separated in July 2019, and Appellant filed a petition for dissolution of marriage in August 2019 in the Circuit Court of Platte County in case number 19AE-DR00305.[] The judge assigned to preside over the dissolution action apparently questioned her ability to

2

address issues relating to the Children without a determination of the parties' legal relationships to the Children. In response, Appellant filed a petition in the Circuit Court of Platte County seeking a declaration of paternity, child custody, parenting time, and child support on behalf of Daughter against Respondent and M.K., and a separate petition seeking the same on behalf of Son against Respondent and R.R. (collectively "Petitions").[] The Petitions each included: (1) a count asking the trial court to determine the parent-child relationship with the Children held by Respondent and the respective donors of genetic material; and (2) a count asking the trial court to award Appellant sole legal and sole physical custody of the Children, to designate Appellant's address as the Children's address, to adopt Appellant's proposed parenting plan, to order that "the payor parent" pay "an adequate amount" for child support, and to order Appellant to provide the Children health insurance. The Petitions were assigned to a different judge than was presiding over the dissolution action.[1]

The first hearing in the paternity actions took place on August 4, 2021, at which time the parties agreed that the three cases – the dissolution action and the two paternity actions – should be heard by the same trial judge. Following the August 4, 2021 hearing, the dissolution action was reassigned to the trial judge assigned to preside over the paternity actions ("trial court").

On November 22, 2021, the trial court held a docket call in the dissolution action and the paternity actions. The parties advised the court that they wanted to first "do the determination of paternity separate and apart," from all other issues in the cases. The trial court confirmed: "[I]t's just going to be paternity only. We're not going to do custody .... [I]t's just going to be who's dad and who's not and all that, okay?" Based on that confirmation, the trial court set the paternity issues in the paternity actions for trial.

The parties appeared on January 19, 2022, for the trial to determine Daughter's paternity, and on February 15, 2022, for the trial court to determine Son's paternity.[] Following testimony from Appellant, Respondent, the guardian ad litem, and the putative fathers, the trial court took the matters under submission.

The trial court issued a judgment and order establishing parent-child relationships with respect to Daughter, and a separate judgment and order establishing parent-child relationships with respect to Son (collectively "Judgments") on April 13, 2022.[] The Judgments concluded that the

---

[1] In the dissolution action and both paternity actions, Respondent also filed motions for third-party custody.

3

evidence established that Daughter was the product of Appellant's and M.K.'s genetic material, and that Son was the product of Appellant's and R.R.'s genetic material. The Judgments observed that the Children were born during the course of Appellant and Respondent's marriage; that Appellant and Respondent were both identified as parents on the Children's birth certificates; and that M.K. and R.R. each agreed with Appellant and Respondent prior to the Children's respective conceptions that, as the biological fathers, they would have no claim or interest in any child that resulted from the attempts at artificially inseminating Appellant. The Judgments, relying on our Eastern District's decision in *Schaberg v. Schaberg*, 637 S.W.3d 512 (Mo. App. E.D. 2021), concluded that to deny "Respondent the marital benefit of being the natural parent of [the Children] would be unconstitutional [because] being on birth certificates, child custody, and child support [are] benefits of marriage to which same-sex couples must have access." As such, the Judgments ordered that the Children were the natural children of Appellant and Respondent, and concluded that M.K. had no claim or interest in Daughter and that R.R. had no claim or interest in Son.

On May 11, 2022, Appellant filed a motion to amend each of the Judgments (collectively "Motions to Amend"). Appellant's Motions to Amend argued that Missouri only recognizes natural parentage or parentage by lawful adoption, neither of which are implicated here with respect to Respondent. The Motions to Amend asserted that, in recognizing Respondent as a natural parent of the Children, the Judgments ignored section 210.834.4, which concerns the results of paternity testing, and section 210.824, which concerns artificial insemination. The Motions to Amend further asserted that the Judgments violated Appellant's right to equal protection in that the trial court treated a same-sex couple differently than a similarly situated opposite-sex couple. Following a hearing on June 10, 2022, the trial court denied the Motions to Amend.

Appellant filed notices of appeal from the Judgments in the Missouri Supreme Court, asserting that the appeals concerned "[t]he validity of a statute or provision of the Constitution of Missouri." The Supreme Court ordered the appeals "transferred to the Missouri Court of Appeals, Western District, where jurisdiction is vested." Upon transfer, we consolidated the appeals.

*Id.* at 390-92 (fourth, fifth, eighth, ninth, tenth, and eleventh alterations in original) (footnotes omitted).

4

We previously dismissed Appellant's appeal for lack of a final judgment because Count II of Appellant's petitions, which requested an order regarding child custody and child support, had not been addressed by the trial court. *Id.* at 393-94. After we dismissed the appeal, Appellant moved to dismiss Count II of each petition without prejudice pursuant to Rule 67.02(b), which the trial court granted.

This appeal follows.

## II. JURISDICTION

First, we must determine whether the Judgments are now final for purposes of appeal. *Complete Constr., LLC v. Frog Eyes, LLC*, 655 S.W.3d 274, 277 (Mo. App. W.D. 2022). As we previously pointed out:

> The existence of a final judgment is a prerequisite for appellate review pursuant to section 512.020(5). A judgment is final if it both: (1) is a judgment in that it "fully resolve[s] at least one claim in a lawsuit and establish[es] all the rights and liabilities of the parties with respect to that claim"; and (2) is final in that it "disposes of all claims (or the last claim) in a lawsuit, or … has been certified for immediate appeal pursuant to Rule 74.01(b)." *Complete Constr., LLC*, 655 S.W.3d at 277 (quoting *Wilson v. City of St. Louis*, 600 S.W.3d 763, 771 (Mo. banc 2020)). If a judgment does not meet both of those criteria, then we must dismiss the appeal. *Id.*

*S.K.*, 665 S.W.3d at 392 (alterations in original).

Respondent argues that the trial court's dismissal of Count II without prejudice in both paternity cases does not make the trial court's judgment final for purposes of appeal because, as we previously pointed out, "issues of legal and physical custody of the children, parenting time and visitation, and child support remained relevant and unresolved . . . following remand."

5

Appellant's voluntary dismissal of Count II of both paternity petitions is sufficient to vest this Court with jurisdiction over this appeal. *See Stewart v. Liberty Mut. Fire Ins. Co.*, 349 S.W.3d 381, 384-85 (Mo. App. W.D. 2011) (holding that the voluntary dismissal of pending claims without prejudice is sufficient to render a judgment final and grant this Court jurisdiction over an appeal). While the existence or nonexistence of a parent-child relationship under Chapter 210 is determinative for all purposes, issues of custody, visitation, support, and "[a]ny [other] matter in the best interest of the child" *may* but are not required to be determined in a paternity action. *See* section 210.841.[2] In other words, issues relating to custody, parenting time, visitation, and child support do not need to be decided in this paternity action and can be decided in another proceeding. Thus, Appellant's dismissal of those issues does not affect our jurisdiction or the finality of the Judgments.

In short, Appellant's voluntary dismissal of Count II in both paternity proceedings renders the Judgments final and thus, we have jurisdiction over this appeal.

### III. STANDARD OF REVIEW

In a judge-tried case, the judgment will be affirmed "unless there is no substantial evidence to support it, unless it is against the weight of the evidence,

---

[2] All statutory citations are to RSMo 2016 as currently updated, unless otherwise noted.

6

unless it erroneously declares the law, or unless it erroneously applies the law."

*Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Here, Appellant argues that the trial court erroneously declared or applied the law. We review a claim that a judgment erroneously declares or applies the law *de novo*. *Lin v. Clark*, 666 S.W.3d 270, 277 (Mo. App. W.D. 2023).

## IV. ANALYSIS

Appellant brings one point on appeal.[3] Appellant argues that the trial court misapplied the law in determining that Respondent is the Children's parent because genetic testing excluded Respondent as the biological parent of the Children and the statutory exception for artificial insemination does not apply in this case because Appellant was not inseminated under the supervision of a licensed physician.

---

[3] Appellant's point relied on is multifarious because it challenges the trial court's application of several distinct statutes. "A point relied on violates Rule 84.04(d) when it groups together multiple, independent claims rather than a single claim of error, and a multifarious point is subject to dismissal." *Kirk v. State*, 520 S.W.3d 443, 450 n.3 (Mo. banc 2017) (citation omitted). In her single point relied on, Appellant argues: (1) that the trial court misapplied section 210.834.4 relating to blood testing; (2) the trial court misapplied section 210.824 relating to artificial insemination; and (3) that the trial court's decision violates Appellant's equal protection rights. Each of these points is an independent claim of error and should be raised in its own point relied on.

Nevertheless, "[w]e do have discretion to review non-compliant briefs *ex gratia* when the argument is 'readily understandable.'" *Interest of S.M.W.*, 658 S.W.3d 202, 212-13 (quoting *Ebert v. Ebert*, 627 S.W.3d 571, 585 (Mo. App. E.D. 2021)) (other citation omitted). Because the Respondent and this Court can understand Appellant's arguments, we choose to exercise that discretion here.

The Missouri Uniform Parentage Act ("UPA"), as set forth in sections 210.817 to 210.854, governs the establishment of parentage in this case.[4] The UPA "has as a fundamental goal the establishment of 'uniformity among paternity determinations across the state.'" *In re Marriage of Fry*, 108 S.W.3d 132, 135 (Mo. App. S.D. 2003) (citation omitted). The UPA "allows claims for declaration of a parent-child relationship based on a biological tie *or a presumption due to marriage or attempted marriage* (either through the paternity presumptions under [section] 210.822 or by consenting to their wives' artificial insemination as provided in [section] 210.824)." *White v. White*, 293 S.W.3d 1, 11 (Mo. App. W.D. 2009) (emphasis added), overruled on other grounds.

In interpreting the UPA, we are governed by the following principles:

> "[T]he primary rule of statutory construction requires this Court to ascertain the intent of the legislature by considering the plain and ordinary meaning of the words used in the statute." *Jones v. Dir. of Revenue*, 832 S.W.2d 516, 517 (Mo. banc 1992). "[E]ach word, clause, sentence and section of a statute should be given meaning." *Hadlock v. Dir. of Revenue*, 860 S.W.2d 335, 337 (Mo. banc 1993). Courts will reject an interpretation of a statute that requires ignoring the very words of the statute. *Id.*

*State ex rel. Womack v. Rolf*, 173 S.W.3d 634, 638 (Mo. banc 2005) (second alteration in original). "Where the language of the statute is clear and

---

[4] Appellant argues that parentage is "exclusively governed by the [UPA]" in Missouri. This is inaccurate. Other Missouri statutory schemes can govern parentage actions in certain circumstances. *See White v. White*, 293 S.W.3d 1, 12 (Mo. App. W.D. 2009), overruled on other grounds; *In re Marriage of Fry*, 108 S.W.3d 132, 135-36 (Mo. App. S.D. 2003).

While the UPA is not the exclusive method for determining parentage, neither party has argued that a different statutory scheme is applicable to this case, nor has our independent research revealed one. As such, we apply the UPA to this case.

unambiguous, there is no room for construction." *Jones*, 832 S.W.2d at 517 (citation omitted). "The legislature will not be presumed to have 'inserted idle verbiage or superfluous language in a statute.'" *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 586 (Mo. banc 2018) (quoting *Civil Serv. Comm'n of the City of St. Louis v. Members of Bd. of the Aldermen of the City of St. Louis*, 92 S.W.3d 785, 788 (Mo. banc 2003)). Indeed, "our Court must avoid statutory interpretations that are unjust, absurd, unreasonable, or render statutory language meaningless." *Mo. Bond Co., LLC v. Devore*, 641 S.W.3d 397, 403 (Mo. App. E.D. 2022) (citations omitted).

A review of the UPA indicates that, by its plain language, it applies to same-sex married couples. Most definitions for the UPA are found in section 210.817, including the definition for "parent", which is defined in subsection (3) to include "either a natural or an adoptive parent[.]" Notably, the word "natural" is not defined in section 210.817, though it is effectively defined in section 210.819, discussed *infra*.

Section 210.817(4) defines the "parent and child relationship" as "the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations.[5] It

---

[5] This language is significant; per *Obergefell v. Hodges*, 576 U.S. 644 (2015), which upheld same-sex marriage, the "legal relationship" that exists between a child and his "natural or adoptive parents" must include the "natural or adoptive" children of a same-sex married couple to the same extent as for opposite-sex married couples. "*Obergefell* specifically lists child custody and child support among the benefits conferred to married couples by the states, which same-sex couples would otherwise be deprived." *Schaberg*,

includes the mother and child relationship and the father and child relationship."

Though the plain language of the definition of "parent and child relationship" includes the mother and child relationship and the father and child relationship, it is notable the definition does not require one of each nor prohibit two of the same. Consequently, the definition of "parent and child relationship" does not exclude the prospect of a child having two mother and child relationships or two father and child relationships, nor does it mandate one of each. Accordingly, section 210.817(4) can be fairly read to contemplate same-sex parents.

Section 210.819 explains that a "natural parent," as those words are utilized in the section 210.817 definitions of parent, and parent and child relationship, *supra*, can be established in one of three ways:

> (1) The natural mother may be established by proof of her having given birth to the child, *or under the provisions of sections 210.817 to 210.852*;

> (2) The natural father may be established under the provisions of sections 210.817 to 210.852;

> (3) An adoptive parent may be established by proof of adoption.

(Emphasis added).

Accordingly, though "natural" is not defined in section 210.817, it is effectively defined for both mothers and fathers in section 210.819(1) and (2), respectively. There, the UPA establishes a mother and child relationship may

---

637 S.W.3d at 523 (citing *Obergefell*, 576 U.S. at 669-70; *Pavan v. Smith*, 137 S.Ct. 2075, 2078 (2017)). Thus, the UPA must be construed (or applied if it cannot be so construed) to permit the recognition of a "legal" parent and child relationship for opposite-sex married couples to the same extent as would be permitted for same-sex married couples.

occur in one of two ways: a natural mother may be established by giving birth to the child, or, alternatively, a natural mother may be established pursuant to "sections 210.817 to 210.852," even if not the birth mother. And, like section 210.817, *infra*, section 210.819 does not prohibit both a birth mother and a woman who qualifies pursuant to any provision of the UPA from being natural mothers of the same child, nor does it mandate that only a woman and a man be the natural parents of a child. It is evident that the plain language of both sections 210.817(4) and 210.819(1) of the UPA can be fairly construed to contemplate same-sex married couples, presuming the statutory requirements of section 210.819(1) are met by both spouses. In the case at hand, one could be the birth mother and thus a "natural mother," while the other could qualify as a "natural mother" pursuant to sections 210.817 through 210.852, as both are allowed by section 210.819.[6] And, in doing so, section 210.819(1) necessarily contemplates that a woman who is not the birth mother can be a "natural mother." Notably, this conclusion is reached without resorting to gender neutral terms, but rather, simply by reliance upon the plain language of the UPA.

**Section 210.822 addresses presumptions of parent-child relationships.**

Though section 210.819(1) expressly contemplates that a "natural mother" can be a woman who is not the birth mother if established as the "natural mother"

---

[6] Or *both* could possibly qualify as "natural mothers" pursuant to sections 210.817 through 210.852, though that is not the situation in the case at hand.

pursuant to sections 210.817 through 210.852 (the remaining provisions of the UPA), when read literally, none of the remaining provisions in the UPA explain how that can be accomplished. For example, section 210.822 talks only about how a "man" can be deemed to be the "presumed . . . natural father of a child[.]" Similarly, section 210.824 speaks of artificial insemination, but only contemplates a "wife" being impregnated by the sperm of a "man not her husband," with the outcome being, if specified procedures are followed, that the "husband" is the "natural father" even though not the biological contributor. And, section 210.826 sets forth a procedure for determination "of the father and child relationship," and provides detailed guidance about those procedures.

Curiously however, despite what appear to be provisions written only to contemplate determining the parent and child relationship for a man/father, section 210.848 addresses actions to declare a mother and child relationship. Importantly, section 210.848 provides that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship[,]" and, specifically states that *"[i]nsofar as possible, the provisions of sections 210.817 to 210.852 applicable to the father and child relationship apply to the mother and child relationship*." (Emphasis added). A fair, if not the only, construction of this statute is that where possible, the provisions of section 210.817 to 210.852 must be read in a gender-neutral fashion.

This interpretation of section 210.848 is consistent with the holding in *Schaberg*, where the Eastern District of this court noted that we are directed to

read statutory schemes as gender neutral if at all possible. 637 S.W.3d at 521 (holding that section 1.030 "prescribes that statutes apply to men and women equally"). This interpretation of section 210.848 is also required by the generally accepted principle of statutory construction requiring us to construe statutory schemes as to give all provisions meaning. *See Hadlock*, 860 S.W.2d at 337 ("[E]ach word, clause, sentence and section of a statute should be given meaning."). The second half of section 210.819(1), which contemplates that a "natural mother" may be someone other than the birth mother, would be rendered superfluous and meaningless unless we read sections 210.817 through section 210.852 in a gender-neutral fashion, where possible, to afford a woman the same opportunity to establish that she is a "natural" parent as is afforded to a man. *See Devore*, 641 S.W.3d at 403 ("[O]ur Court must avoid statutory interpretations that are unjust, absurd, unreasonable, or render statutory language meaningless.") (citation omitted)); *Kanatzar*, 543 S.W.3d at 586 ("The legislature will not be presumed to have 'inserted idle verbiage or superfluous language in a statute.'") (quoting *Civil Serv. Comm'n of the City of St. Louis*, 92 S.W.3d at 788)). That includes giving women the benefit of the presumptions set forth in section 210.822. *See Schaberg*, 637 S.W.3d at 521 (holding that section 210.822 must be afforded a gender-neutral reading).

We then turn back to the aforementioned section 210.822, which sets forth presumptions of paternity,[7] how such presumptions can be rebutted, and the standard of proof applied thereto. There, the UPA includes as relevant to this case, two presumptions used to determine the parent-child relationship. First, section 210.822.1 states:

> A man [or woman] shall be presumed to be the natural father [or natural mother] of a child if:
>
> (1) He [or she] and the child's natural mother [or natural father] are or have been married to each other and the child is born during the marriage [(hereinafter, the "marital presumption")], . . . .
>
> . . .
>
> (4) An expert concludes that the blood tests show that the alleged parent is not excluded [as a parent to a required statutory threshold] [(hereinafter, the "blood test presumption")].

---

[7] The use of section 210.822 in determining who may be a "natural mother" is not precluded by the utilization of the word "paternity" in setting forth the presumptions. "Paternity" is not found in the section 210.817 definitions of the UPA. When a term is not defined in a statute, we turn to the dictionary. *See Show-Me Inst. v. Office of Admin.*, 645 S.W.3d 602, 609 (Mo. App. W.D. 2022). "Paternity" is defined in Black's Law Dictionary as "the state or condition of a father; the relationship of a father." *Paternity*, BLACK'S LAW DICTIONARY (6th ed. 1990). Similarly, the standard dictionary defines "paternity" as "the quality or state of being a father." *Paternity*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/paternity (last visited Mar. 26, 2024). Notably, neither the "legal" or "standard" dictionary definition refers to the need for a biological relationship, and instead focuses on the nature of the relationship with the child; a relationship equally applicable to men and women. Because we must read section 210.822 in a gender-neutral fashion, *Schaberg*, 637 S.W.3d at 521, and because the definition of "paternity" can just as easily relate to women as men, the section 210.822 presumptions are more properly addressed as "presumptions of parent-child relationship," rather than "presumptions of paternity." Accordingly, we will address these as presumptions of a parent-child relationship, rather than presumptions of paternity, from this point forward and bracket ([ ]) the opposite sex for context in that regard.

14

Either presumption "may be rebutted in an appropriate action only by clear and convincing evidence[.]" Section 210.822.2. Subsection 2 then provides how to proceed when two of the 210.822.1 presumptions are in conflict, stating in part, "If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls."[8]

---

[8] In its entirety, section 210.822 provides:

1. A man shall be presumed to be the natural father of a child if:

(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred days after the marriage is terminated by death, annulment, declaration of invalidity, or dissolution, or after a decree of separation is entered by a court; or

(2) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with the law, although the attempted marriage is or may be declared invalid, and:

(a) If the attempted marriage may be declared invalid only by a court, the child is born during the attempted marriage or within three hundred days after its termination by death, annulment, declaration of invalidity or dissolution; or

(b) If the marriage is invalid without a court order, the child is born within three hundred days after the termination of cohabitation; or

(3) After the child's birth, he and the child's natural mother have married or attempted to marry each other by a marriage solemnized in apparent compliance with law, although the marriage is or may be declared invalid, and:

(a) He has acknowledged his paternity of the child in writing filed with the bureau; or

(b) With his consent, he is named as the child's father on the child's birth certificate; or

(c) He is obligated to support the child pursuant to a written voluntary promise or by court order; or

15

This is precisely the inquiry the trial court conducted below. In the case at hand, both the section 210.822.1(1) marital presumption and the section 210.822.1(4) blood test presumption are implicated. The marital presumption is made because Appellant, the birth mother and a "natural mother" pursuant to the first portion of section 210.819(1), and Respondent, the non-birth mother who is a presumptive "natural mother" pursuant to the latter portion of section 210.819(1) were married to each other and both children were born during that marriage, thus implicating section 210.822.1(1). Second, blood tests did not exclude two men as the biological contributors for the two children, leading to the section 210.822.1(4) blood test presumption. Accordingly, following section 210.822.2's directive, the trial court balanced the conflicting presumptions based on the weightier considerations of policy and logic, and concluded M.K. and R.R., whose section 210.822.1(4) blood tests established a biological relationship with the Children,

---

(4) An expert concludes that the blood tests show that the alleged parent is not excluded and that the probability of paternity is ninety-eight percent or higher, using a prior probability of 0.5.

2. A presumption pursuant to this section may be rebutted in an appropriate action only by clear and convincing evidence, except that a presumption under subsection 1 of this section that arises from a blood test or the filing of an acknowledgment of paternity in a state or territory in which the blood test or the filing creates a conclusive presumption by law also has conclusive effect in Missouri. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing the paternity of the child by another man.

16

were not the "natural fathers," and instead determined that the Children had two "natural mothers," based on the section 210.822.1(1) marital presumption.

In so finding, the trial court properly applied the law, acted within its statutory authority, and did not err in doing so. Indeed, we agree that consideration of the evidence in this case leads to the result reached by the trial court based on the section 210.822.2 "weightier considerations of policy and logic". Here, Appellant and Respondent were both identified as parents on the Children's birth certificates, and M.K. and R.R. each agreed with Appellant and Respondent prior to the Children's respective conceptions that, as the biological fathers, they would have no claim or interest in, and no contact or relationship with, any child that resulted from the artificial insemination of Appellant. Additionally, Respondent had been held out to the Children and the world as the natural parent of the Children, and actively participated in raising them as a parent. And, M.K. and R.R. never had parenting time with the Children, were never involved in decision-making concerning the Children, were never asked to provide emotional, financial or physical support to the Children, and, though both appeared at trial neither of them advocated for their own parenting time or any other rights with regard to the Children. Thus, "weightier considerations of policy and logic" clearly support a finding of Appellant and Respondent as the Children's natural parents. Indeed, no policy would be served by finding a parent and child relationship between disinterested donors like M.K. and R.R. and the Children, nor would logic dictate such a result.

17

**The final sentence of section 210.822 does not defeat the aforesaid presumptions of parent-child relationships.**

Our determination is not foreclosed by the final sentence of section 210.822.2. As previously stated, that section provides: "A presumption pursuant to this section may be rebutted in an appropriate action only by clean and convincing evidence . . . . If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. *The presumption is rebutted by a court decree establishing the paternity of the child by another man*." (Emphasis added).

At first blush, this final (italicized) sentence appears to be in irreconcilable conflict with the preceding sentence, which authorizes a court to resolve conflicting presumptions based on policy and logic considerations without any one presumption carrying more weight than any other presumption. However, such a reaction is grounded in the false premise that the word "paternity" is the equivalent of the phrase "blood test," which as we have thoroughly discussed, ignores that the reference to "man" must be read in a gender neutral manner to include "woman." Indeed, the UPA is to be read gender-neutrally, and as explained *supra*, "paternity" is not defined in the UPA, which leaves us with its dictionary definition that refers to the nature and state of a father-child relationship, with no mention of a *biological* relationship. Thus, "paternity" must be read to refer to the "parent and child relationship," meaning that the last sentence of section 210.822.2 must be

read as any of the section 210.822.1 presumptions will be rebutted "by a court decree establishing the paternity [parent and child relationship] of the child by another man [or woman]." *See also Schaberg*, 637 S.W.3d at 521 (holding that section 210.822 must be afforded a gender-neutral reading).

Our conclusion that "paternity" [parent and child relationship] is not the equivalent of a mere blood test is further buttressed by section 210.836, which addresses what is to be considered as "[e]vidence relating to paternity[.]" As we have already determined, this must be read in a gender-neutral manner as "[e]vidence relating to paternity [parent and child relationship]." This section addresses "evidence" a court may rely on to enter a section 210.822 "court decree establishing the paternity [parent and child relationship]" of a child. Importantly, that evidence is *not* limited to blood tests. Rather, it provides:

> Evidence relating to paternity *may include*:
>
> (1) [evidence of sexual intercourse between two people during the possible time of conception]
>
> (2) [expert opinion about the probability one is the father based on duration of the birth mother's pregnancy]
>
> (3) [blood test results]
>
> (4) [medical or anthropological evidence based on tests performed by experts]; and
>
> (5) *All other evidence relevant to the issue of the paternity of the child*.

Section 210.836 (emphasis added).

19

First, we note the prefatory statement of section 210.836 states that evidence "relating to paternity [parent and child relationship] *may* include. . ." (Emphasis added). It does not state the statutory list is exclusive, exhaustive, or that any particular category of evidence contained therein is conclusive. Rather, the emphasized language of subsection 5 plainly indicates that the particular categories of evidence listed in subsections 1 through 4 are not exclusive, and further, it allows *any* evidence deemed relevant to paternity (parent and child relationship) to be considered. Accordingly, section 210.836 contemplates a virtually unlimited array of "relevant" evidence in considering paternity (the parent and child relationship), and certainly evidence of same is not limited to blood tests.

Stated differently, had the legislature intended that the only evidence relevant to determining the issue of paternity (the parent and child relationship) be a blood test establishing a *biological* connection, or that such evidence be patently conclusive to establishing paternity (the parent and child relationship), then section 210.836 would so state, as would the last sentence of section 210.822.2. Further, had the legislature intended that the only evidence relevant to determining the parent and child relationship be a blood test, section 210.822.2's provision permitting the resolution of conflicting presumptions on the "weightier considerations of policy and logic" would except from its scope the blood test presumption and would instead so state that the blood test presumption is patently

20

conclusive.[9]  Thus, to read section 210.822.2 as solely focusing on a blood test in

determining paternity (the parent and child relationship), would be to ignore

_____

[9] Our determination regarding section 210.822 requires us to address *Courtney v. Roggy*, 302 S.W.3d 141 (Mo. App. W.D. 2009), abrogated on other grounds, in which this Court held that a blood test result presumption under section 210.822.1(4) constitutes "clear and convincing" evidence that rebuts the section 210.822.1(1) marital presumption. *Id*. at 146-47.  In that case, a wife, while married to her husband, had an affair, which resulted in wife becoming pregnant. *Id*. at 144.  Husband knew he was not the biological father of the child, because he was sterile as a result of a vasectomy prior to the child's conception.  *Id*.  Having not been aware of wife's affair, husband believed that her pregnancy was the result of rape, as wife had told him.  *Id*.  Husband later learned of the affair but remained married to wife and desirous of serving as the child's "Dad."  *Id*.

Almost six years after the child's birth, wife's paramour filed a petition seeking a declaration of his paternity of the child.  *Id*. at 145.  Husband stipulated that the child was not his biological child and that the paramour was the child's biological father.  *Id*. at 144.  The court declared the paramour to be the child's father and awarded wife sole legal and physical custody of the child.  *Id*. at 145.

On husband's appeal, this Court rejected the premise that husband's section 210.822.1(1) marital presumption should control over the paramour's section 210.822.1(4) blood test presumption.  *Id*. at 145-47.  We noted that section 210.822.2 "dictates that courts follow a two-step process in applying the statute": first, courts must "ascertain whether there is 'clear and convincing' evidence to rebut a presumption that a presumed natural father is, in fact, the natural father[,]" and second, if competing presumptions "remain," courts must then engage in the section 210.822.2 weighing test to determine which presumption, "on the facts, is founded on the 'weightier considerations of policy and logic.'"  *Id*. at 146.  We then held that we did not need to proceed to the second step, in that clear and convincing evidence rebutted husband's martial presumption, specifically husband's testimony that he had been sterile during the child's conception and the parties' agreement that the paramour was the child's natural father.  *Id*. at 146-47.  Ultimately, we found there was no evidence to rebut the paramour's blood test presumption.  *Id*. at 147.

Initially, we note that *Courtney's* holding – which appears to support Appellant's argument concerning section 210.834.4 *infra* – is not based on section 210.834.4 at all.  Section 210.834, discussed in detail *infra*, is not even mentioned within the opinion.  Rather, this holding depends on an interpretation of section 210.822.2 that is markedly different from our construction of that section, *supra*.  We find it difficult, if not impossible, to reconcile *Courtney's* interpretation of section 210.822.2 with the plain language of that statute or the legislature's apparent intent in drafting the UPA, as we have expansively set forth.

Specifically, *Courtney's* holding misinterprets section 210.822.2's pronouncement that "[a] presumption pursuant to this section may be rebutted in an appropriate action only by clear and convincing evidence[.]"  If read plainly and in context, that language

21

section 210.836 and the remainder of section 210.822 altogether, and would render those sections superfluous. *See Devore*, 641 S.W.3d at 403 ("[O]ur Court must avoid statutory interpretations that are unjust, absurd, unreasonable, or render statutory language meaningless.") (citation omitted)).

Notably, the Judgments are appropriately titled in a gender-neutral fashion as "Judgment and Order Establishing *Parent/Child Relationship*." And, the Judgments do exactly what section 210.822.2 contemplates. First, the Judgments

---

means that any particular section 210.822.1 presumption can be rebutted by clear and convincing evidence defeating the stated basis for that particular presumption. For example, if a blood test suggests a high-percentage chance of a biological relationship, but clear and convincing evidence establishes that the blood submitted was taken from the wrong child, or that the lab procedures were so flawed as to call into question the results, then the section 210.822.1(4) blood test presumption could be defeated. It does not mean, as *Courtney* holds, that proof of one section 210.822.1 presumption may clearly and convincingly defeat *another* section 210.822.1 presumption. If that were the case, the trial court's authority to weigh competing presumptions as provided in section 210.822.2 would be rendered meaningless. Indeed, a blood test result would be afforded a "super-presumption" status, when section 210.822 lists it as one of several presumptions that can compete with each other. As explained above, to do so would mean that a blood test result would never create a scenario of competing presumptions as contemplated by section 210.822.2 because it would *always* identify the biological father and make same a "super-presumption" over all other section 210.822.1 presumptions. And, this would similarly render meaningless the entirety of section 210.836 and the array of evidence relevant to the issue of "paternity," discussed *supra*.

For these reasons, the accuracy of *Courtney's* holding as it relates to section 210.822 is questioned. We thus find it necessary to overrule this court's holding in *Courtney* to the extent it reads section 210.822.2 as deeming one section 210.822.1 presumption "clear and convincing" evidence able to rebut another section 210.822.1 presumption. *See Novak v. Kan. City Transit, Inc.*, 365 S.W.2d 539, 546 (Mo. banc 1963) ("[W]here it appears that an opinion is clearly erroneous and manifestly wrong, the 'rule [of] *stare decisis* is never applied to prevent the repudiation' of such a decision.") (quoting *O'Leary v. Ill. Terminal R. Co.*, 299 S.W.2d 873, 879 (Mo. banc 1957))).

Because this opinion refuses to follow statements made in this Court's prior opinion in *Courtney*, the opinion has been reviewed and approved by order of the Court *en banc*. *See* S. Ct. Operating Rule 22.01; Mo. App. W.D. Special Rule 31.

22

found that the evidence established that Daughter and Son were each the product of a third-party, male contributor's genetic material. This triggered the presumption of a natural parent and child relationship between the Children and their biological contributors per section 210.822.1(4). Second, the Judgments found that the Children were born during the marriage of Appellant and Respondent, thereby triggering section 210.822.1(1)'s presumption of a natural parent and child relationship between Respondent and the Children. The trial court then resolved these conflicting presumptions as it is permitted to do pursuant to section 210.822.2 in favor of "the presumption which on the facts is founded on the weightier considerations of policy and logic[.]"

Further, as authorized by the last sentence of section 210.822.2, the Judgments are "court [orders] establishing the [parent and child relationship]" between the Children and Respondent, the entry of which rebuts the blood test presumption in favor of M.K. and R.R. as described in section 210.822.1(4). In making this authorized determination, the trial court considered evidence as permitted by section 210.836, specifically the catchall provision of subsection 5 that allows consideration of "[a]ll other evidence relevant to the issue of the paternity of the child." As described above, the Judgments clearly demonstrate such evidence included the knowing and intelligent agreements entered into between Appellant, Respondent, M.K., and R.R.; that Respondent had been held out to the Children and the world as the natural parent of the Children, and actively participated in raising them as a parent; and that M.K. and R.R. never had

parenting time with the Children, were never involved in decision-making concerning the Children, and were never asked to provide emotional, financial or physical support of the Children. In short, when the trial court concluded that the Children were the natural children of Respondent, it did so consistent with the plain language of the UPA, modified only to make the language gender-neutral as required by section 1.030, *Schaberg*, and *Obergefell*. The final sentence of section 210.822.2 does not affect the result of our opinion.

### Section 210.834

Undeterred, Appellant further argues that the trial court misapplied the law in determining that Respondent was the natural parent of the Children because, as stated in section 210.834.4 (as read gender-neutrally), the blood tests excluding Respondent as a biological parent have a "conclusive" effect, and thus negate the 210.822.1(1) marital presumption, which is merely a rebuttable presumption. In so arguing, Appellant is utilizing that portion of section 210.822.2 which provides that a section 210.822.1 presumption, including the marital presumption, "may be rebutted in an appropriate action only by clear and convincing evidence[.]" We disagree with Appellant's characterization.

Section 210.834 states:

1. The court may, and upon request of any party shall require the child, mother, alleged father, any presumed father who is a party to the action, and any male witness who testifies or shall testify about his sexual relations with the mother at the possible time of conception, to submit to blood tests [to be performed by an expert described in subsection 7].

2. The court, upon reasonable request by a party, may order that independent tests be performed by other experts . . . .

3. If any party refuses to submit to blood tests ordered by the court pursuant to subsection 1 or 2 of this section, such refusal shall constitute civil contempt of court and shall be admissible as evidence in the action. In addition, upon motion and reasonable notice to the party refusing to submit to blood tests, the court shall, except for good cause shown, enter an order striking the party's pleadings and rendering a judgment by default on the issue of the existence of the parent-and-child relationship.

4. Whenever the court finds that the results of the blood tests show that a person presumed or alleged to be the father of the child is not the father of such child, such evidence shall be *conclusive of nonpaternity and the court shall dismiss the action as to that party*, and the cost of such blood tests shall be assessed against the party instituting the action unless the family support division . . . is a party to such action, in which case the cost of such blood tests shall be assessed against the state. The court shall order the state to pay reasonable attorney's fees for counsel and the costs of any blood tests where such blood tests show that the person presumed or alleged to be the father of the child is not the father of such child and the state proceeds further in an action pursuant to sections 210.817 to 210.852 to attempt to establish that such person is the father of the child.

5. Certified documentation of the chain of custody of the blood or tissue specimens is competent evidence to establish such chain of custody. An expert's report shall be admitted at trial as evidence of the test results stated therein without [further foundation unless specifically challenged].

6. The provisions of subsection 5 of this section shall also apply when the blood tests were not ordered by the court, if the court finds that the tests were conducted by an expert as defined in subsection 7 of this section.

7. [The definition of an "expert" for UPA purposes].

(Emphasis added).

Initially, it is important to note that *nowhere* in section 210.834 is "*paternity*" defined to mean a blood test demonstrating a biological relationship. This observation is significant in that it continues to highlight our prior discussion concerning the final sentence of section 210.822.2 ("[t]he presumption is rebutted

25

by a court decree establishing the paternity of the child . . . ."), namely that it does not contemplate the conclusive effect of a blood test or biological connection in determining the issue of *paternity*. Indeed, the final sentence of section 210.822.2 contains no cross reference to section 210.834 and does not refer to blood tests; instead, it uses the undefined term "paternity," which, as discussed, *supra*, has a commonly understood dictionary meaning which is much broader than a biological connection.

Yet, section 210.834.4 does address a "relationship" between blood tests and *nonpaternity*, as demonstrated in the following pertinent language:

> Whenever the court finds that *the results of the blood tests* show that a person presumed or alleged to be the father of the child is not the father of such child, such evidence *shall be conclusive of nonpaternity* and the court shall dismiss the action as to that party . . . .

(Emphasis added). Importantly, we read sections in a statutory scheme *in pari materia*, and as consistent as possible so that no provision is rendered meaningless. *Holmes v. Steelman*, 624 S.W.3d 144, 149 (Mo. banc 2021) ("In determining the meaning of words in a statute, the words should not be read in isolation but rather 'must be considered in context and sections of the statutes in *pari materia*, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words.'" (quoting *Cosby v. Treasurer of State*, 579 S.W.3d 202, 206 (Mo. banc 2019))). In doing so, the goal is to ascertain legislative intent and to give effect to that intent if possible. *See Cosby*, 579 S.W.3d at 206.

26

In applying these *in pari materia* principles to section 210.834.4, we read its plain language in context. In doing so, we reach the conclusion that section 210.834.4 is intended to apply only to the question of "<u>non</u>paternity," not "paternity" as Appellant argues, and thus only to assist a person who is contesting the effort of another to establish the existence of a parent and child relationship. Stated differently, section 210.834.4 affords a person alleged to be a child's biological parent an absolute means by which said person can defeat an effort to declare that relationship – even if other presumptions under section 210.822 might support finding a parent and child relationship.

This conclusion can be reached because section 210.834.4 expressly states that blood tests are conclusive on the issue of "*non*paternity." Section 210.834 generally addresses court-ordered blood tests, suggesting the statute is intended to enable a party or a state agency to compel a presumptive or alleged parent to take responsibility for that role when they do not do so voluntarily, or when there is a question as to who the biological parent is. Indeed, section 210.834.1 provides that a "court may, and upon request of any party shall require" parties to submit to blood tests, and the trial court "may order that independent tests be performed by other experts" pursuant to section 210.834.2. Further, the statute anticipates recalcitrant parties (i.e., those *not* wanting to be declared a biological parent) in section 210.834.3, stating that if a party "refuses to submit" to subsection 1 or 2 testing, the refusal "shall constitute civil contempt", that such refusal "shall be admissible as evidence", and for good cause shown the court "shall" in some

27

instances strike the recalcitrant party's pleadings altogether and render "judgment by default on the issue of the existence of the parent-and-child relationship." Finally, after noting that a blood test is conclusive in determining "nonpaternity," section 210.834.4 provides that, upon such a nonpaternity determination "the cost of such blood tests shall be assessed against the party instituting the action . . . ." This contemplates a contested scenario where the party ordered to take the blood test was challenging the existence of a parent and child relationship, whether presumptive or alleged.

In short, section 210.834.4 should be read as a "shield" to protect someone who is challenging an assertion that they have a biological relationship to a child, and who is thus seeking a declaration of *non*paternity. To utilize section 210.834.4 as a "sword" to block a person who a) *wants* to be declared to have a parent and child relationship and b) has a statutory basis for claiming a right to that relationship such as the section 210.822.1(1) marital presumption, as Appellant would have us do, betrays the underlying intent of the statute. This must be the result, because such a reading of section 210.834.4 is the *only* way that section 210.822.2 and section 210.836 are not rendered meaningless.

Indeed, if not read in this manner, it would never be the case that the section 210.822 competing presumptions would be considered, and that section would be rendered meaningless by the "conclusive" blood test result of section 210.834.4. Further, the vast array of evidence which may be considered in determining paternity as stated in section 210.836 would also be rendered meaningless if a

section 210.834 blood test was simply "conclusive," as the Appellant argues. *See Devore*, 641 S.W.3d at 403 ("[O]ur Court must avoid statutory interpretations that are unjust, absurd, unreasonable, or render statutory language meaningless.") (citation omitted). Thus, section 210.834 must be read as only applying to a determination of *non*paternity, not paternity.

In so construing section 210.834.4, we recognize two Missouri cases to which Appellant directs us, and which have touched upon this section. Neither of them, however, dissuade our construction of section 210.834.

First, Appellant refers us to *D.S.K. ex rel. J.J.K. v. D.L.T.*, 428 S.W.3d 655 (Mo. App. W.D. 2013), in which this Court ruled that a husband who was excluded as the biological father to three children born to wife during their marriage could not intervene as a matter of right in a paternity action filed by wife. *Id.* at 660. There, wife had filed a declaration of paternity asking the court to declare her deceased paramour the father of her three children. *Id.* at 656. Wife named the paramour as the respondent in the paternity action and named husband as a third-party respondent. *Id.* By that time, in a related but separate dissolution action between wife and husband, the court had ordered husband to undergo blood testing, which indicated husband was not the biological father of the children. *Id.*

Husband thereafter sought *his own dismissal* from the paternity action on the basis of section 210.834.4. *Id.* at 657. At the same time, husband sought to intervene as a party in the paternity action pursuant to Rule 52.12, solely for the

purpose of asserting a claim for third-party custody and visitation.[10] *Id.* at 657-58. Wife agreed husband should be dismissed from the paternity action based on section 210.834, but opposed the motion to intervene. *Id.* at 657. The court subsequently granted husband's motion to be dismissed from the paternity action, but denied his motion to intervene as a matter of right in that case. *Id.*

On appeal, this Court held that husband had no right under Rule 52.12 to intervene in the paternity action, because no issue other than paternity (such as custody) was raised by the paternity petition. *Id.* at 659-60. Other than a passing reference as part of the procedural background, section 210.834.4 was not addressed in the opinion. We did *not* hold, therefore, that section 210.834.4 required husband's dismissal from the paternity action; indeed, that issue was not before us because husband had sought (and was granted) dismissal from the paternity action based on section 210.834.4. In seeking dismissal pursuant to blood tests which evidenced he was not the biological father of his wife's children,

---

[10] In doing so, husband asserted he was the only father the children had ever known, he was the children's primary parent, and the ultimate paternity judgment "may include provisions concerning the custody of the minor children and visitation privileges with the minor children." *Id.*

Husband utilized section 210.834.4 just as we have stated it was intended to be used.[11] Accordingly, *D.S.K.* does not benefit Appellant in the present case.[12]

Appellant next directs us to *Jefferson v. Jefferson*, 137 S.W.3d 510 (Mo. App. E.D. 2004). There, wife and husband had two children born during their marriage and a daughter born two years before the marriage.[13] *Id.* at 512. Based on wife's representation, husband believed he was elder daughter's biological father, but after seeking a dissolution from wife, husband learned through a blood test that he was excluded as daughter's biological father. *Id.* In response to this result, husband filed a Chapter 210 petition seeking to determine the parent and child relationship – essentially desiring that *nonpaternity* be declared. *Id.* at 512, 517.[14]

---

[11] That said, it is apparent section 210.822.1(1), the marital presumption of parent and child relationship, could have come into play in either the dissolution or paternity proceedings, and if utilized, section 210.822.2's "weightier considerations of policy and logic" could have been considered in determining whether said marital presumption or the section 210.822.1(4) blood test indicating deceased paramour had a parent and child relationship would prevail. This, however, was not before the *D.S.K.* court.

[12] We question the validity of the holding in *D.S.K.* that husband had no right to intervene. Section 210.826 expressly gives a person who is presumptively in a parent and child relationship the right to initiate an action to determine that relationship. This suggests one should be able to intervene in such an action if pending. However, this, too, was not before the *D.S.K.* court.

[13] Importantly, this meant the section 210.822.1(1) marital presumption did not apply to husband and the elder daughter. Thus, as to this daughter the trial court was not faced with competing section 210.822.1 presumptions, nor weighing competing presumptions based upon the section 210.822.2 "considerations of policy and logic[.]"

[14] Following the petition filed by husband, wife filed a counter-petition asking for an equitable parent and child relationship to be declared between husband and daughter, but husband filed a motion to dismiss the counter-petition, which was granted by the court. *Id.* at 512-13.

31

Not surprisingly, the Eastern District of this court, on appeal noted that section 210.834.4 "provides that a blood test is conclusive evidence of nonpaternity if results so indicate." *Id.* at 514 (citation omitted). In so finding, *Jefferson* supports our interpretation of section 210.834.4 as a "shield" to conclusively determine *non*paternity when a party who is a presumptive or alleged parent is seeking such determination. *Jefferson* does not address, suggest, or require interpreting section 210.834.4 as a "sword" to force a *non*paternity determination on a person who *wants* a declaration of paternity and has some statutory basis for so arguing, such as the marital presumption. Accordingly, it is of no benefit to Appellant.

To conclude, section 210.834 does not foreclose a construction of section 210.822.2 that permits the trial court to do what it did here, that is, resolve conflicting presumptions in favor of a person who wants to be declared to be in a parent and child relationship, and who has a statutory basis for asking for that relief in light of a favorable presumption of parentage. Appellant's challenge on this point is without merit.

### Section 210.824 Artificial Insemination Procedures

Finally, we address the artificial insemination challenge raised by Appellant, specifically that, because the method of artificial insemination used by Appellant did not precisely comport with the procedures set forth in section 210.824, Respondent cannot be found to be a "natural mother" of the Children as a matter of law. This argument is not supported by the plain language of the UPA.

32

Section 210.824 states:

1. If, under the supervision of a licensed physician and with the consent of her [spouse], a wife is inseminated artificially with semen donated by a man not her [spouse], the [spouse] is treated in law as if he [or she] were the natural [parent] of a child thereby conceived. The [spouse]'s consent must be in writing and signed by him [or her] and his [or her] wife. The physician shall certify their signatures and the date of the insemination, and file the [spouse]'s consent with the bureau, where it shall be kept confidential and in a sealed file. The physician's failure to comply with this section shall not affect the [parent] and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown.

2. The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived.

Here, it is undisputed Appellant did not conceive either Child through artificial insemination supervised by a licensed physician, nor was written consent obtained from Appellant's wife, the Respondent. Accordingly, it is apparent the parties did not comply with the specifics of section 210.824 in mutually participating in the at-home artificial insemination of Appellant. Section 210.824, however, does not state that if artificial insemination is undertaken in a manner *not* in compliance with the procedures described therein, that, as a matter of law, a spouse who is not a biological contributor cannot be found to be a natural parent.

Notably, Appellant fails to cite any portion of section 210.824 which would require the reading she suggests. Rather, she stands solely on the fact that the statute was not complied with, therefore Respondent's parentage claim must fail. To read this *unstated* penalty into section 210.824, as Appellant urges us to do,

33

would be to ignore that the section 210.817 definitions of "parent" and the "parent and child relationship" contemplate that a woman who is not a birth mother can nevertheless be a natural parent, as well as that the presumptions of a natural parent and child relationship set forth in section 210.822 are not in any way expressly limited by section 210.824.

Further, taken to its logical extreme, Appellant's suggestion would lead to an absurd reading of the statute. By way of example, consider an opposite-sex couple who follows the artificial procedures as expressly described in section 210.824, but are not married at the time the child is conceived, though they are married at the time the child is born. According to Appellant's suggested reading of section 210.824, the man would have no path to becoming a "natural parent" because section 210.824.1 requires a "*wife*" to be inseminated with the consent of her "*husband*" and they were not married at the time of conception. We find it difficult to consider such an unreasonable conclusion. Further, such an absurd interpretation of section 210.824 would also lead to direct conflict with section 210.818, which expressly states that "[t]he parent and child relationship extends equally to every child and every parent, regardless of the marital status of the parents." *See Townsend v. Jefferson Cnty. Sheriff's Dep't*, 602 S.W.3d 262, 265 (Mo. App. E.D. 2020) ("[W]e must construe statutes so as to avoid unreasonable, oppressive, or absurd results." (citation omitted)).

Additional support for this conclusion is found in section 210.824.1's pronouncement that "[t]he physician's failure to comply with this section shall not

34

affect the [parent] and child relationship." This clearly indicates that strict compliance with the statute in order to be allowed the privilege of being a natural parent was not contemplated by the legislature.

Instead, section 210.824 must be read in context as a safe harbor which *ensures* that a spouse who is not a biological contributor will be deemed the natural parent of the child as a matter of law. *See Townsend*, 602 S.W.3d at 265 ("We must interpret a statute in context, not reading any portion of the statute in isolation." (citation omitted)). And, naturally, it follows that if a married couple's method of artificial insemination does not comport with section 210.824, the spouse who is not a biological contributor will not be *ensured* of a finding that he or she is the natural parent of the child as a matter of law pursuant to section 210.824. *However*, such a spouse would not be foreclosed from the possibility of such a finding pursuant to the section 210.822.1 marital (or, perhaps other, relevant) presumption, and on the trial court's authority pursuant to section 210.836(5) to consider all evidence relevant to the issue of the parent and child relationship in determining whether that legal relationship exists. As thoroughly discussed above, that is precisely what happened here.

In short, the only reading of section 210.824 that can be supported by a review of all the provisions of the UPA together is to recognize that it creates a safe harbor in favor of finding a natural parent and child relationship if the procedures therein described are followed, but that it does not foreclose a finding that a person who is not a biological contributor is nonetheless a natural parent merely because

35

procedures not compliant with section 210.824 were utilized to artificially inseminate the birth mother. This argument by Appellant is without merit.

Lastly, we note that Appellant's argument stops short of addressing the question of *who is* the second, natural parent, when an anonymous donor provides semen used to conceive a child but section 210.824 is not precisely followed. And, interestingly, if we agreed with Appellant (which we do not), and simply presumed, in general, an anonymous donor could be found to be a natural parent as Appellant would have us do, one must wonder what chilling effect it would have on potential donors, knowing that but for precise compliance with section 210.824 they may unwittingly be named the natural parent and assume all the necessary burdens associated therewith. Clearly, in this case, Appellant would have the donors named as natural parents of the respective children, *knowing* both donors had previously agreed to have no claim or interest in any child that resulted from the insemination, have no contact or relationship with the child, and would not be identified on any resulting child's birth certificate. Thus, Appellant knows she would essentially be the sole, natural parent. What appears to be lost in her argument is the recognition of what sweeping ramifications it could potentially have not only for anonymous donors, but also for those married couples who must rely on section 210.824 to have a child of their own if we were to agree with Appellant's argument.

We find that the trial court did not erroneously declare or apply the law.

## V. CONCLUSION

For the foregoing reasons, the Judgments of the trial court are affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.